J-A07021-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1351 MDA 2023 |

Appeal from the Order Entered September 13, 2023
In the Court of Common Pleas of Cumberland County
Juvenile Division at No(s): CP-21-DP-0000101-2022

| | | |
|---|---|---|
| IN RE: K.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1353 MDA 2023 |

Appeal from the Decree Entered September 13, 2023
In the Court of Common Pleas of Cumberland County
Orphans' Court at No(s): 023-ADOPT-2023

BEFORE:   STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.:                     **FILED: APRIL 19, 2024**

---

[*] Former Justice specially assigned to the Superior Court.

J.T. ("Mother") appeals from the decree terminating her parental rights to her daughter, K.T. ("Child"), born in July 2022.[1]  Mother also appeals from the order changing Child's permanency goal from reunification to adoption. Upon review, we affirm the termination decree and dismiss the appeal from the goal change order as moot.

The trial court detailed the factual and procedural history of this matter, as follows:

> [In July 2022], the same day that Child was born, Cumberland County Children and Youth Services (henceforth "CCCYS"), received a referral regarding [Child] and her Mother due to concerns that Mother's intellectual and developmental disabilities as well as housing instability impacted her ability to safely care for [C]hild. . . .  [The trial court] provided a verbal order for CCCYS to receive emergency protective custody of [Child] for placement into the [care] of [kinship parents].[2]
>
> As a result of the verbal emergency protective custody order . . . [,] a shelter care hearing was held . . . and it was ordered that [Child] remain in the legal and physical custody of CCCYS for continued placement with [kinship parents].  Mother appeared for the shelter care hearing and evidence presented included that Mother's parental rights were involuntarily terminated by Lancaster County . . . regarding [Child's older sibling].  Mother's housing was historically unstable as she had been moving between Lancaster, Dauphin, and Cumberland counties.  Since July [] 202[2], she had provided CCCYS three different addresses for where she was supposedly living and as a result, her current

---

[1] By separate decree of the same date, the trial court additionally terminated the parental rights of any unknown father.  No unknown father filed an appeal or participated in the instant appeals.

[2] Child's older sibling was also placed with those "kinship parents," so designated because both children were placed with them.  Kinship parents adopted Child's older sibling in August 2022.  **See** N.T., 9/12/23, at 6-7, 89.

residence had not been viewed by CCCYS. The hospital staff where [Child] was born reported Mother needed to be supervised with [Child] as, although she demonstrated love and care towards her newborn, Mother was not capable of caring for [Child] safely and effectively without supervision. Lancaster County's child welfare agency had performed a parenting assessment of Mother that concluded she required supervision to properly care for a child[,] with that conclusion rooted in assessments of Mother's limited cognitive abilities. [The hearing officer] determined [the order] for emergency protective custody should be ratified[,] and directed [Child] to remain in the legal and physical custody of CCCYS for continued placement in the kinship home of her sibling's pre[-]adoptive parents. . . . CCCYS [then] filed a dependency petition alleging that [Child] was without proper parental care, control[,] and supervision placing her health, safety[,] and welfare at risk[,] as well as having been born to a parent whose parental rights to another child had been involuntarily terminated within the last three years. The allegations of lack of proper parental care and supervision involved Mother's ongoing homelessness and housing instability since at least 2020.

An adjudicatory hearing was held [i]n August [] 2022 . . . . Mother had moved yet again since the shelter care hearing . . .. Following an adjudicatory hearing, it was determined that [Child] was a dependent child based upon clear and convincing evidence and she was to remain placed in the legal and physical custody of CCCYS in her kinship home with her sibling.[3]

A permanency plan was developed for Mother . . . and subsequently revised. . . . Mother was ordered to develop and maintain appropriate and effective communication with service providers, obtain and maintain stable housing, meet and provide for [Child]'s physical, emotional[,] and developmental needs, address mental health and IDD [("intellectual and developmental disability")] needs and improve parenting skills.

Trial Court Opinion, 11/16/23, at 1-3 (unpaginated) (footnotes omitted).

_____

[3] The court additionally established a permanency goal of reunification and a concurrent goal of adoption.

Throughout the ensuing dependency proceedings, the court conducted regular permanency review hearings after which it maintained Child's commitment and placement. Although the court found aggravated circumstances existed as to Mother because her parental rights to Child's older sibling had been involuntarily terminated, it did not excuse CCCYS from the requirement it provide reasonable efforts toward reunification.

From August 2022 to August 2023, Mother engaged in guided visitation at Alternative Behavior Consultants ("ABC"), participating in 22 of 42 visits.[4] *See* N.T., 9/12/23, at 14, 17-18, 26-27; *see also* CYS Exhibit 4 JUV. In August 2023, Mother transitioned to ABC's Skills program, and participated in four sessions. ABC terminated Mother from the program two weeks prior to the subject hearing because it received reports people unknown to ABC were living in Mother's home. *See id*. at 19-20, 99-100; *see also* CYS Exhibit 4 JUV.

Against the advice of service providers, Mother moved to Perry County in January 2023. *See* N.T., 9/12/23, at 58, 94. She

> moved in with a female roommate who had an open case with Perry County [CYS]. In or around May 2023, the female roommate [and her two children] moved out [after a volatile relationship with Mother,] and [Mother and her boyfriend assumed the lease]. Service providers . . . reported there [we]re other adults residing in the apartment. Mother admitted that two weeks prior to the hearing, two adult friends had just moved into the

---

[4] Notably, Mother's visitation reverted to [CCCYS] from March 2023 through May 2023 due to her inconsistency. *See* N.T., 9/12/23, at 14, 92-93.

apartment. She had only known the one adult for approximately two weeks.[5]

Trial Court Opinion, 11/16/23, at 10 (unpaginated), Findings of Fact ¶ 5, subparagraph m.

In June 2023, CCCYS filed a petition to change Child's permanency goal from reunification to adoption and a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The trial court held an evidentiary hearing. Child, then almost fourteen months old, was represented by a separate guardian *ad litem* ("GAL") and legal counsel. *See* 23 Pa.C.S.A. § 2313(a).[6] Mother was present and represented by counsel.

The court heard substantial testimony regarding Mother's continued unstable housing situation. Both CCCYS caseworker, Whitney Taylor, ("Ms. Taylor") and Jessica Hoffman ("Ms. Hoffman"), senior human services case manager for MH/IDD, testified they discouraged Mother from moving to Perry County because of its distance away and because it would result in less

_____

[5] Immediately prior to the move to Perry County, Mother was in and out of shelters, motels, and friends' homes in Cumberland County. While she was placed on an assisted housing list, she rejected such housing options on two occasions, most recently just prior to moving to Perry County. *See* Trial Court Opinion, 11/16/23, at 9 (unpaginated).

[6] Both the GAL and legal counsel argued in favor of termination and goal change at the conclusion of the subject hearing. *See* N.T., 9/13/23, at 141-143. Neither submitted briefs to this Court.

services being available to Mother. **See** N.T., 9/13/23, at 58, 58, 95. Moreover, both Ms. Taylor and Ms. Hoffman expressed serious concerns about Mother's housing situation in Perry County. **See id**. at 59, 94-95. Ms. Taylor noted problems with Mother's female roommate who not only had "an open case" with Perry County CYS, but two autistic, nonverbal and physically aggressive children who posed a threat to another child's safety. Ms. Taylor told Mother those conditions were a bar to reunification. **See id**. at 59, 95.

Following an unspecified period in a motel, Mother and her boyfriend assumed the lease for the Perry County home and have occupied it since sometime in May 2023, when the roommate left with her children. **See id**. at 58-59, 97. Ms. Taylor stated that Mother could not afford the rent without her boyfriend. **Id.** at 115. Ms. Taylor and Ms. Hoffman also testified other people lived in the apartment and Mother attempted to conceal that fact from them. **See id**. at 61, 98-100, 115. Ms. Taylor further explained, "It was also reported that the parent educator was not supposed to let me know about these people, that it's none of my business. So[,] I felt that there was manipulation going on there where [Mother] purposely wasn't being truthful about people in her home." **Id**. at 116.

Mother testified, at the time of the hearing, she and her boyfriend resided with a couple whom she described as their "best friends." However, Mother then testified that she had known at least one of them for only two weeks prior to their moving into her home. **Id**. at 123, 134-35. Mother did

not know and had not asked, if either person had a criminal record. ***See id***. at 136. She admitted her boyfriend's niece and her children resided with them previously in the home. ***See id***. at 124. Mother also acknowledged she did not tell CCCYS about the people residing with her and did not understand the importance of being honest with her caseworker. ***See id***. at 124-25.

The testimony at the hearing demonstrated Mother's mental health treatment was inconsistent, and it was unclear whether she was taking her medication regularly and as directed. ***See id***. at 32-33, 37-38, 102-03, 118-19. Both Ms. Hoffman and Ms. Taylor acknowledged that Mother had been treating at Sadler Health and had made efforts to assist Mother in securing alternative treatment. ***See id***. at 61-62; 102-03. Mother conceded she was not currently receiving mental health treatment. ***See id***. at 125-26. She indicated plans to start treatment with a new provider via telehealth. ***See id***. at 125-26, 140. While Mother testified she consistently takes her mental health medication, her primary care provider, Ms. Spiese, disagreed. ***See id***. at 37-38; 125-26; ***see also id***. at 118-19.

Mother also exhibited persistent problems including a lack of retention, relaying unreliable information, and failing to appreciate the impact of her behaviors on Child's safety. ***See id***. at 17-18, 40-41, 64-65, 93-94, 104-09, 117. Ms. Spiese expressed, "[Mother] is not consistent with her presentation of facts . . . . [Y]ou don't know what's happening in [Mother]'s life because it could really be anything." ***Id***. at 40-41. Ms. Spiese and others related

Mother's false statements regarding issues as significant as pregnancy and her father's death. *See id*. at 40-41, 64-65, 93-94. Ms. Taylor expressed concern about Mother's failure to address her mental health, and her lack of understanding of how that affected Child's safety. Although Ms. Taylor had discussed the matter weekly with Mother for one year, Mother failed to understand the concern and challenged its validity. *See id*. at 109.

Ms. Taylor additionally testified Mother lied about Child's condition, including that she was having seizures, which falsity created concern for Child's safety. *See id*. at 104-07. Kinship Mother and Child's initial primary care provider echoed these concerns.[7] *See id*. at 87-88, 44, 48.

By decree, the trial court involuntarily terminated Mother's parental rights to Child. By separate order dated and entered the same day, the court also changed Child's permanency goal from reunification to adoption.

Mother, through court-appointed counsel, filed separate, timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated Mother's appeals *sua sponte*. The trial court filed a responsive Rule 1925(a) opinion.

On appeal, Mother raises the following issues for our review:

> 1. Whether the trial court erred as a matter of law and abused its discretion when it found that Mother's parental rights should be terminated pursuant to 23 Pa.C.S.[A.] § 2511(a)(8) as [CCCYS]

---

[7] Kinship Mother testified Mother's false reports of Child's medical problems resulted in a recommendation that Child obtain a different medical provider. *See* N.T., 9/13/23, at 87-88.

- 8 -

did not provide sufficient evidence at the hearing on [its] petition for termination of Mother's parental rights to establish that the conditions which led to the removal of [Child] from Mother's care and placement of Child in foster care continue to exist and termination of parental rights would best serve the needs and welfare of [Child]?

2. Whether the trial court erred as a matter of law and abused its discretion when it found that [Child's] permanency goal of reunification was neither appropriate no[r] feasible, and ordered a goal change to adoption, thus contravening 42 Pa.C.S.A. § 6351(f)?

3. Whether the trial court erred as a matter of law and abused its discretion in changing the goal from reunification to adoption when the conditions which led to removal/placement of [Child] no longer existed or were substantially eliminated, thus contravening 42 Pa.C.S.A. § 6351(f)?

4. Whether the trial court erred as a matter of law and abused its discretion determining the best interests of [Child] would be served by changing the goal to adoption when [Mother] had met or was meeting all her permanency plan goals, and was ready, willing, and able to parent [Child] and provide for her needs, thus contravening 42 Pa.C.S.A. § 6351(f)?

Mother's Brief at 5-6 (issue reordered, unnecessary capitalization eliminated, spacing corrected).

Our standard of review is as follows:

[I]n cases involving involuntary termination of parental rights[, our review] is limited to determining whether the trial court's determination is supported by competent evidence. When applying this standard of review, an appellate court must accept the findings of fact and credibility determinations of the trial court if they are supported by evidence of record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion. An abuse of discretion is found where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. ***It matters not that an appellate court might have reached a***

- 9 -

***different conclusion***, as it is well-established that absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand.

***In re Adoption of L.A.K.***, 265 A.3d 580, 591 (Pa. 2021) (internal citations omitted; emphasis added).

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. ***See*** 23 Pa.C.S.A. §§ 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). ***See id***. § 2511(b). This Court need only agree with one of the grounds set forth in subsection (a) to affirm, provided subsection (b) is also satisfied. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004).

Instantly, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother has failed to preserve and thus waived any challenge related to section 2511(a)(1), (2), and (5). ***See In re M.Z.T.M.W.***, 163 A.3d 462, 465-66 (Pa. Super. 2017) (citations omitted) (explaining this Court will not review an appellant's claim unless it is included in the statement of questions involved, developed in the argument, and supported by citation to relevant legal authority).

We review Mother's challenges to termination pursuant to subsections (a)(8) and (b), which provide as follows:

- 10 -

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy section 2511(a)(8), the petitioner must prove: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the

child.  *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017).  Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing."  *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009).  This Court has acknowledged:

> [T]he application of [s]ection (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children.  By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities.  This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.  Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

*Id*. at 11-12 (emphasis in original; internal citations omitted).

Finally, this Court has also explained that,

> while both section 2511(a)(8) and section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by section 2511(b); as such, they are distinct in that we must address section 2511(a) before reaching section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

In the instants matter, the trial court explained:

> Mother has not shown an ability to provide safe and stable care for [Child].  Since her birth, [Child's] day to day needs and individual care have been provided by her kinship care parents. Mother has not been able to demonstrate an ability to provide

[Child] with safe or stable housing or that she can exercise safe parenting skills. Mother has a documented history of exercising poor insight and judgment into identifying what is safe housing and which individuals are safe to live with or invite to one's home. Despite various service providers attempting to assist in this area, Mother has not consistently received mental health counseling and services. Mother's lack of consistent visitation with [Child] during [Child's] first fifteen months of life has resulted in Mother's inability to meet [Child's] physical comfort needs and strengthen[ed Child's] close connection to her kinship family. Despite . . . efforts to reunify Mother and [Child] following a finding of aggravated circumstances due to a prior involuntary termination of parental rights regarding an older child, Mother was unable to complete any of her permanency goals essential to ensure a safe return of [Child] to her physical care. It has been over fifteen months since [Child's] birth and placement in the kinship home yet Mother is not any closer to providing [Child] permanency by way of reunification than she was at the time of placement.

Trial Court Opinion, 11/16/23, at 12-13.

Initially, it is undisputed that Child had been removed from Mother's care for over twelve months. At the time of the subject hearing, Child had been placed since July 2022, almost fourteen months. *See* N.T., 9/12/23, at 6, 8. Consequently, the evidence met the first prong of section 2511(a)(8).

Mother assails the second statutory prong, *i.e.*, whether the conditions which led to Child's removal or placement still exist. To the extent Mother asserts the reasons for Child's placement were "substantially alleviated," she has stable housing, mental health treatment, and responded to prompts during her guided visitation, defeating the sufficiency of proof of section (a)(8), *see id*. at 22-23, we disagree.

Ample evidence supports the trial court's finding "[M]other has been unable to remedy the significant concerns regarding her housing, parenting skills and mental health resulting in the need for ongoing placement . . .. [Child] has been in the custody of CCCYS for more than [twelve] months with the conditions which led to her removal continuing to exist." Trial Court Opinion, 11/16/23, at 13 (unpaginated).

Child was placed due to concerns for parental care and control related to Mother's mental health and intellectual functioning, and homelessness. *See* N.T., 9/12/23, at 6. As discussed above, the record reveals these concerns remained. Accordingly, the evidence proved the second prong of section (a)(8).

Likewise, the record also supports the court's determination regarding the third and final prong of section 2511(a)(8), *i.e.*, that termination will best serve the needs and welfare of Child. *See* Trial Court Opinion, 11/16/23, at 12-13 (unpaginated). Specifically, the certified record indicates CCCYS's concerns regarding Child's safety while in Mother's care persisted at the time of the hearing because Mother consistently made poor decisions, including the choice to have virtual strangers reside in her home. *See* N.T., 9/12/23, at 71-72, 107-08.

For these reasons, we discern no abuse of discretion by the court in concluding the termination of Mother's parental rights will best serve Child's needs and welfare pursuant to section 2511(a)(8).

Having found sufficient grounds for termination pursuant to section 2511(a)(8), we must next determine whether termination was proper under section 2511(b). Section 2511(b) affords primary consideration to the developmental, physical, and emotional needs and welfare of the child. **See In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013). Regarding the section 2511(b) best interest analysis, this Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the [trial] court must examine the status of the bond to determine whether its termination would destroy an existing, necessary[,] and beneficial relationship. . ..
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011) (internal citations, quotations, brackets, and indentation omitted).

The evaluation of a child's respective bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation

omitted). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

Furthermore, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. In weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. Children "are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

As our Supreme Court recently explained in *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023),

> a court conducting a [s]ection 2511(b) analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

In addition, the *K.T.* Court explained that the inquiry must consider and weigh certain evidence if it is present in the record, including, but not limited to, the child's "need for permanency and length of time in foster care . . .; whether

the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id*. (footnote omitted).

The record supports the trial court's determination that termination served Child's developmental, physical, and emotional needs and welfare pursuant to section 2511(b). The court reasoned:

> [Child] is residing in the same home as her sibling who was previously adopted by the kinship parents. The kinship mother identified a close and healthy sibling relationship between [Child] and this sibling. [Child] has been residing in this kinship home her entire life as she was placed there from the hospital. She is closely connected to her kinship parents and older sibling. She is now over fifteen months old and has had all of her physical, social[,] and developmental needs met by the kinship parents. This home is a safe and stable environment with dependable caregivers capable of providing her with love and care she needs to promote her health[y] development.

Trial Court Opinion, 11/16/23, at 13 (unpaginated). We agree.

As indicated, Mother participated in guided visitation through ABC from August 2022 to August 2023.[8] This visitation was inconsistent, and Child was often upset and crying, and Mother's attendance at visits remained

---

[8] As ABC's visitation supervisor, Linda Mapes ("Ms. Mapes), explained, "Guided visitation has more prompts, more assistance, helping wherever it needs. More parent education than our regular Steps program, which basically provides for the safety of the children. Safety is also included with guided but it's more educational, more assistance." N.T., 9/12/23, at 13.

inconsistent from August 2022 to August 2023. *See* N.T., 9/12/23, at 14, 17-18, 26-27, 79.

Despite acknowledging some positive visits, in response to whether she observed any bond between Mother and Child, Ms. Mapes stated Mother, "[t]ried really, really hard. [Mother] would console her or try to console [Child]. [Child] oftentimes would start to cry as soon as we got in the room. We did have several visits towards the end of visitation where [Child] was happy and played, and then [Mother] would miss a visit and getting restarted was always hard for [Child]." *Id.* at 26; *see also id*. at 26-27, 79 (recounting kinship mother's impression of Child after visits).

Mother's visitation remained guided until August 2023, when the Agency made a referral to Skills (a home-based, hands-on parenting skills program) through ABC. *Id*. at 19-20, 99. Mother participated in four sessions with the Skills program but was terminated from the program two weeks prior to the subject hearing due to reports of other people in the home, which she denied. *See id*. at 99-100, 111. Mother had not visited with Child since that time. *Id*. at 100.

Further, Child has resided in her current kinship home her entire life. She is bonded with her kinship family, which includes her older sibling, and doing well. Ms. Taylor testified, "she always seeks comfort from [kinship mother]. She seeks comfort from her [sibling]. She seems to be very comfortable within the home. . . . [S]he's usually a very happy baby/toddler.

*Id*. at 109-10. Because of this, Ms. Taylor, as well as Child's GAL, testified adoption would be in her best interests. *See id*. at 110, 142-43.

As the trial court's findings pursuant to section 2511(b) are supported by the certified record, and free from legal error, we will not disturb them. Mother and Child do not share a necessary and beneficial relationship pursuant to section 2511(b). *See K.T.*, 296 A.3d at 1113. Indeed, the record reveals no parent-child bond exists between Mother and Child. Rather, Child shares a parent-child bond and beneficial relationship with her kinship family, whom she has resided with her entire life.

Given our disposition concerning termination, Mother's challenge to the goal change order, reflected by issues two through four, are moot. *See Interest of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021) (finding issues regarding goal change are moot once parental rights are terminated).

Based on the foregoing, we affirm the decree involuntarily terminating Mother's parental rights and dismiss the appeal of the goal change order as moot.

Decree affirmed. Appeal from goal change order dismissed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/19/2024